NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-579


STATE OF LOUISIANA

VERSUS

JAMES STUBBLEFIELD


**********


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 08K5272C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and J. David Painter, Judges.


AFFIRMED.

**Earl B. Taylor**
**27th JDC District Attorney**
**Jennifer Ardoin**
**Assistant District Attorney**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR STATE- APPELLEE:**
 **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT- APPELLANT:**
 **James Stubblefield**

**PICKETT, Judge.**

## PROCEEDINGS BELOW

On January 27, 2009, a St. Landry Parish grand jury charged the defendant, James Stubblefield, with the aggravated rape of J.S. on or about August 18, 1994.[1] Following trial on the merits, the petit jury in the defendant's case found him guilty as charged. Thereafter, on April 21, 2011, the district court sentenced the defendant to serve the mandatory life sentence at hard labor and without benefit of probation, parole, or suspension of sentence.

## ASSIGNMENTS OF ERROR

1. The trial court erred in admitting into evidence State Exhibit 8, in violation of Appellant's Confrontation Rights guaranteed to him by the Sixth Amendment of the United States Constitution.

2. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove all of the elements of the offense of aggravated rape.

## STATEMENT OF FACT

The following testimony was given at trial. J.S. was born on August 30, 1983. On August 18, 1994, she, her older brother J.D.S., and her mother were all staying in a hotel in Opelousas. J.D.S. was eighteen months older than J.S. J.S.'s mother was at work when the incident occurred. The incident occurred around 8:30 or 9:00 p.m. when J.S. and J.D.S. were alone in the room. Someone knocked on the door, so J.S. and J.D.S. went to the door. J.S. testified that when she looked through the peep hole, she saw a tall male with a medium build; he seemed really tall to her at the time. J.D.S. asked who was at the door, and the man replied that

---

[1]Initials are being used to protect the identity of the victim in accordance with La.R.S. 46:1844(W).

1

their mother had sent him to ask if they needed anything from the store. J.S. and J.D.S. were not allowed to leave the room when their mother was gone.

J.S. said that she and J.D.S. made the mutual decision to open the door so they could speak with the man, so J.D.S. opened the door a crack. They did not have a chain on the door. The man repeated that their mother had sent him to see if they needed anything from the store and to get whatever they needed for them. J.S. said they told the man that they were okay and did not need anything. At that point, the man entered the room without being invited and shut the door behind him.

J.S. recalled that, once the man was in the room, he asked them if they had any money. J.S. and J.D.S. looked at each other, but they did not reply. They began to suspect something was wrong because the man, who had just offered to get them something from the store, was now asking them for money. J.S. did not see a weapon, and, at first, the man just stood there and looked around. When J.S. and J.D.S. restated that they were okay, the man looked at J.S. and told her he wanted to talk to her in the bathroom. J.S. asked her brother why the man wanted to talk to her in the bathroom. At that point, the man instructed J.D.S. to sit on the bed and to not move. He also demanded J.S. accompany him to the bathroom. J.S. said she was frightened, but she went with the man into the bathroom.

J.S. related that once they were in the bathroom the man closed the door, told her to take off her pants, and instructed her to get on the floor. J.S. did not remember what type of pants she was wearing at the time. J.S. said that after she took her pants down, the man removed them from her ankles. She had nothing else on. The man then took off his pants, knelt down, and put his penis inside of her. When she screamed for her brother, the man threatened to kill J.D.S. if she did not "shut up." J.S. stopped making noise. At one point J.S. again screamed for her

2

brother.  This time, the man put his hands on her mouth and once more threatened to kill her brother if J.S. screamed again.  J.S. stopped screaming.  When the man was done, he stood up and put his pants back on.  He then told her not to leave the bathroom or put on her clothes until he was gone or he would harm J.D.S.  The man repeatedly threatened to kill J.S.'s brother.  J.S. still had not seen a weapon, but she said she believed him.

J.S. reported that, once the man left the bathroom, she did not obey him. She went ahead and put her underwear back on.  J.S. did not really remember what she was wearing.  She ran out of the bathroom and became even more scared because her brother was gone; J.S. thought the man had taken her brother.  J.S. then ran out of the hotel room and saw her brother running around the corner with the hotel manager.  J.S. did not remember much that occurred after that except being taken to the hospital.  J.S. did not remember any writing on her thigh.  J.S. explained that, by the time of the incident, she had already started her menses. However, she was not menstruating at the time of the incident.  As a result of the trauma, her menses started after the incident.

On cross-examination, J.S. said she was not sure if she had put on the same clothes after the incident that she had been wearing beforehand.  J.S. also explained she recalled that the rape kit examination at the hospital had been painful. J.S. elaborated that the man had penetrated her vaginally and that the penetration hurt enough to make her scream.  J.S. reiterated that she did not remember having writing on her thigh.  J.S. also did not remember the emergency room physician who treated her.  J.S. said that, after the examination, she was released from the hospital, and her mother brought J.S. to her employer's home.

3

Dr. Kenneth Scott Parks, an expert in emergency room medicine, was the next witness to testify for the prosecution. Dr. Parks explained that State's Exhibit 1 consisted of the medical records from J.S.'s emergency room visit on August 18, 1994. Dr. Parks was the doctor who examined J.S. on that visit. He did not, however, remember the case specifically. Dr. Parks read the notation that he wrote at the time of the examination:

> Ten year old, sexual assault earlier tonight. Describes tall, black male, whom she was familiar with as he works at motel. Patient let assailant inside. He told her to go into bathroom. Then to remove pants. Patient states she screamed after which male put his hand to her mouth and told her he would kill her if she didn't stop. Male forced patient to ground and moved on top of her. Patient states he place sexual organ inside her. Patient describes pain in lower abdomen with this. Afterwards he asked for money. Patient stated she had none. Male left. Patient denies being hit, pushed, thrown, etc. Has no complaints of pain prior to examine other than feeling hungry. Vitals noted.

Dr. Parks' notes then refer to separate notes regarding the rape kit. Dr. Parks said he found no trauma during his exam; however, he was not surprised because rape does not necessarily cause trauma. This was true even in a case where the victim was a young girl. Dr. Parks prepared the rape kit in the instant case. On cross-examination, Dr. Parks stated that he had found writing on J.S.'s right inner thigh. It read, "F_ _K YOU."

Sergeant Kenneth Edwards, with the Opelousas Police Department, was the State's third witness. Around midnight on August 18, 1994, Sergeant Edwards was dispatched to the Ranch Motel in Opelousas because there had been report of a rape. At the time Sergeant Edwards was a patrolman first class. Sergeant Edwards relayed what J.S. told him:

> Well, she basically said that uh, she heard a knock on the door. She opened the door. A black male approximately 6 foot, hardly any hair in his face, he was dark complected [sic], a baseball cap, and black t-

shirt with some writing on it knock[ed] on the door. She basically opened the door and at that time he came in and her brother was there also- [J.D.S.] The black male told the brother to uh, continue to lay down and keep his head down and he at that time told her to uh, pretend that she wanted to go to the bathroom. Which at that time she stated that she went in the bathroom and uh, the black male subject went in the bathroom right behind her and also at that time, after entering the bathroom, he asked her for money. She told him that she ain't had no money, which at that time, he told her to pull her pants down. She screamed no and uh, at that time she also yelled for her brother. And once done that, she noticed he took his pants down and uh, pretty much stated that he raped her.

Sergeant Edwards explained that, as part of his investigation, he asked J.S. to give him the clothing she was wearing at the time of the incident. As a result, J.S. provided Sergeant Edwards with a pair of pants from the room where the attack occurred. Sergeant Edwards recalled that J.S. was very emotional at the time; she was "crying, nervous, scared." Sergeant Edwards told her that she would be all right and not to worry. J.S. was worried that the man was still around and would try to kill her, so Sergeant Edwards reassured her that the man was no longer around and that Sergeant Edwards was there instead, so there was nothing to worry about.

On cross-examination, Sergeant Edwards stated that he personally collected the pants introduced at State's Exhibit 3 from J.S. in the bathroom. Sergeant Edwards said J.S. was wearing the clothes he collected when he first arrived on the scene.

Captain Craig Thomas, with the Opelousas Police Department, was the State's fifth witness.[2] Captain Thomas had known the defendant throughout his

---

[2]Rodney Doomes, an investigator with the St. Landry Parish District Attorney's Office, was the fourth witness for the prosecution. Mr. Doomes retrieved State's Exhibit No. 4 from the district attorney's evidence vault.

sixteen-year career as a police officer. As part of his duties, Captain Thomas obtained a DNA sample from the defendant on May 6, 2001.

Carolyn Booker, with the Acadiana Crime Lab, was the sixth witness for the prosecution. The court accepted Ms. Booker as an expert in forensic science with a specialty in DNA analysis. As part of her duties, Ms. Booker examined the DNA sample Captain Thomas obtained from the defendant on May 6, 2001. Ms. Booker analyzed the DNA sample and generated a DNA profile for the defendant.

Ms. Booker's job title was CODIS Administrator. CODIS means Combined DNA Index System. CODIS is a database of DNA profiles and can be referenced at lab (local) level, at state level, or at a national level. The DNA profiles from unsolved cases can be entered into CODIS at any level to check for matches. If a match is made, then investigators have possibly solved their case. As CODIS Administrator, Ms. Booker's was responsible for verifying that the DNA samples entered into CODIS met with state and federal guidelines. Ms. Booker was also the person who uploaded the DNA profiles from the lab and sent them to the state to be searched.

Ms. Booker reported that her work was subject to peer review and approval. George Schiro checked her work on the defendant's DNA profile and approved her work. When Mr. Schiro's peer review was completed on June 14, 2002, Ms. Booker entered the defendant's DNA profile into CODIS. The defendant's DNA was collected as a result of the search for the South Louisiana Serial Killer, who turned out to be Derrick Todd Lee. Samples from over five hundred known subjects were collected and compared to the serial killer cases. In an effort to link the serial murders to earlier similar cases where the victim survived for the purpose of obtaining possible witnesses against the serial killer, the legislature provided

6

extra funding to create DNA profiles for old unsolved cases. This resulted in DNA profiles being created in all unsolved sexual assault cases. The additional case load required the crime lab to outsource the profiling of some of those cases to three different private labs. The private labs were approved by the Acadiana Crime Lab on the basis that they followed all federal guidelines for DNA testing.

Ms. Booker stated that the pink pants collected by Sergeant Edwards were examined for potential DNA evidence. Those swatches of fabric yielding such possible evidence were removed from the garment. This process, in accordance with general procedures, was performed in 1994 before Ms. Booker began her employment with the Acadiana Crime Lab. Ms. Booker sent cuttings from the pink pants for DNA profiling as part of the search for cases related to the serial murders.

Ms. Booker explained that there were no names in the CODIS database. If a match returned pursuant to a search for a specific DNA profile, she usually had to fill out a form and submit a request for the name of the person who contributed the matching DNA profile to the State Police Crime Lab. The State Police Crime Lab then had to verify the match and rework the matching profile in CODIS to make sure that it had not been switched. The State Police Crime Lab would inform Ms. Booker to whom the sample in CODIS belonged only after ensuring that the person's DNA profile matched the one contained in CODIS. Once the Acadiana Crime Lab obtained the name of the potential match, it would then notify the relevant law enforcement agency with the information. The law enforcement agency would then usually be required to obtain a second DNA sample from the suspect so that another DNA profile could be generated and compared to the DNA profiles obtained from both the evidence collected and the CODIS system.

However, in the instant case, no second DNA sample was required because they had performed the DNA analysis for the defendant's DNA sample at the Acadiana Crime Lab.

Dr. Nasir Butt was the State's seventh witness. At the time of trial, Dr. Butt was the supervisor for the DNA Department at the Cuyahoga County Governor's Office in Cleveland, Ohio. From 2001 until 2004, Dr. Butt was employed at DNA Reference Lab in San Antonio, Texas, as a DNA analyst and forensic scientist. The court accepted Dr. Butt as an expert in forensic science with a specialty in DNA identification. As part of his work in San Antonio, Dr. Butt separately examined a cutting taken in J.S.'s case and a blood sample provided by J.S. He then generated individual DNA profiles from each. One of the samples submitted by the Acadiana Crime Lab was stained with semen, so, using the DNA profile of the victim, Dr. Butt was able to extract the DNA profile of the semen contributor. On cross-examination, Dr. Butt explained that the cutting examined by his lab was taken from J.S.'s pants.

The prosecution's ninth witness was George Schiro.[3] Mr. Schiro was the DNA technical leader and biology section supervisor for the Acadiana Crime Lab. The court accepted Mr. Schiro as an expert forensic scientist with a specialty in DNA analysis. Mr. Schiro conducted the peer review of Ms. Booker's analysis of the defendant's DNA. He determined that Ms. Booker had generated a scientifically reliable DNA profile.

---

[3]Kevin Ardoin, the Lab Director of the Acadiana Crime Lab, was the State's eighth witness; he testified that he brought State's Exhibit No. 5-A and 5-B to the courtroom from the crime lab's evidence vault.

Mr. Schiro participated in establishing the protocol and criteria for outsourcing the evidence from the Acadiana Crime Lab for DNA profiling. Mr. Schiro agreed with Ms. Booker's description of the process. Mr. Schiro did not personally review the protocols followed by DNA Reference Lab in San Antonio, but Ray Wikinheiser, the director of DNA Reference Lab, did so. Mr. Wikinheiser reviewed all of DNA Reference Lab's documentation as part of the accreditation process. Mr. Schiro personally reviewed the documents contained in State's Exhibit No. 7 and performed an independent analysis of the documents in order to form an opinion concerning the validity of the conclusions contained therein.

Mr. Schiro said that State's Exhibit No. 8 was a general worksheet used for notes when evidence is screened. Mr. Schiro noted that the sheet was initialed by Dean Lonceaux, who was retired from the Acadiana Crime Lab but working for the lab as a contract employee. Ms. Lonceaux was a lab technician. She was the person who examined bulk evidence and screened it to see if there was anything on those items requiring further analysis. Ms. Lonceaux recorded what was done, including any cuttings made, and she was also the person who cut the fabric. The worksheet referred to State's Exhibit No. 3 (the pink pants), cuttings taken therefrom, and identified the locations on State's Exhibit No. 3 from which the cuttings were taken. Using the worksheet, Mr. Schiro correlated the cuttings contained in State's Exhibit No. 5-A to the cutting locations listed in State's Exhibit No. 8.

Mr. Schiro explained that he reviewed both Ms. Booker's work on the Defendant's saliva sample and Dr. Butt's work on the cutting prior to them being matched in CODIS. After reviewing the work and the match, Mr. Schiro

9

concluded that the defendant was the person who contributed the sperm found on the cutting:

> When we did the CODIS match, we obtained a match between the reference sample of James Stubblefield and the major contributor of the sperm fraction from the pants that was generated by DNA Reference labs and to a reasonable degree of scientific certainty [99.9%] bar[r]ing identical twins, James Stubblefield is the source of that DNA profile that was found on the pants.

The odds of selecting someone else with the same DNA profile was one in 530,000,000,000,000 (five hundred thirty trillion), and there are roughly only 6,000,000,000 (six billion) people on Earth.

On cross-examination, Mr. Schiro reported that no spermatozoa was found on the samples taken for the rape kit. Sperm was only present on the pants. There were nine total cuttings taken from the pants. The only one of the cuttings that yielded semen was "from the left rump of the pink pants." On re-direct examination, Mr. Schiro clarified that each of the cuttings were taken because they indicated that the specific area of the pants had semen, blood, or both.

Dr. Nasir Butt was recalled to the witness stand after Mr. Schiro testified. Dr. Butt explained that he only tested one of the cuttings from the pants. He tested that particular sample because it appeared to have seminal material. As per protocol, once he located one sample and confirmed the presence of seminal material, he did not test the remaining cuttings as additional testing would serve no purpose.

The prosecution also recalled Ms. Booker to testify. When CODIS returned a match in the instant case, she examined and compared the two DNA profiles to verify that they matched. It was her expert opinion that the defendant's known DNA profile matched the DNA profile recovered from the pink pants.

10

J.D.S., J.S.'s brother, was the state's next witness. J.D.S. remembered that he and J.S. were living in a hotel on August 18, 1994. They had been there approximately six months. They lived there with their mother. Sometime that evening or early in the morning, an unknown man knocked on the door. The man's face looked familiar, possibly because he had been around or near the children before. The man mentioned their mother by her full name and informed them that she had given him money for their dinner that evening. The man had never before been in their room.

J.D.S. explained that no one besides his mother, his sister, and himself had been in the room while they lived there. They did not even have maid service because they cleaned the room themselves. It was the result of an arrangement between J.D.S.'s mother and the management. The door was locked when the man knocked. J.S. opened the door, and the man entered the room. The man waited a minute before beginning to hand over money and requesting J.D.S. go to sleep. The man told J.S. to go use the bathroom and then go to sleep.

J.D.S. recalled that he laid down and J.S. went into the bathroom. The man followed J.S. into the bathroom and closed the door. J.D.S. subsequently heard banging and his sister screaming. J.D.S. tried to open the door, but he was unable to enter, so he ran to the front and called the police. J.D.S. immediately returned to the room, but the man was gone. J.D.S. was able to generally describe the man and recalled that the man had a nice smile and made himself seem trustworthy. However, J.D.S. was unable to identify the offender in the courtroom at the time of trial.

On cross-examination, J.D.S. denied writing the phrase on J.S.'s inner thigh. J.D.S. stated that he would never do such a thing. On redirect examination, J.D.S.

11

thought it was unlikely that J.S. ever said he had written the phrase on her. J.D.S. did not know anything about the writing until the day of trial. J.D.S. did not know who wrote the phrase.

The prosecution recalled J.S. to testify after her brother. J.S. identified the pink pants as her mother's pants. She could not recall if she had been wearing them. She often wore her mother's pants to bed. She agreed J.D.S.'s testimony was accurate. No one, including housekeeping and the perpetrator, had previously entered the room while she, her brother, and mother lived there.

On cross-examination, J.S. explained that, though her mother owned the pink pants, she never wore them, so J.S. "took them over." J.S.'s mother worked in a bar and did not usually wear hot pink pants to work. J.S. "inherited" the pants from her mother. J.S. confirmed that her brother had not written the message found near her vagina. J.S. had been unaware of the writing, so she would not have been unable to tell hospital personnel who wrote it. J.S. said that the entire incident, from the time the man entered the hotel room, lasted approximately fifteen minutes. J.S. stated that she had informed the medical personnel that the man acted as if he knew her mother, so she had supposed that the man might have been someone who was from around the motel or who worked at the attached restaurant. J.S. never said that she knew who the man was. Otherwise, the man would have already been in jail.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER TWO

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. *State v. Hearold*, 603 So.2d 731 (La.1992). The defendant urges that there was insufficient evidence to prove both that he was the perpetrator and that there was penetration.

The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

At the time of the offense, the aggravated rape statute read as follows:

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

> (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.

> (2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.

13

(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.

(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.

(5) When two or more offenders participated in the act.

B. For purposes of Paragraph (5), "participate" shall mean:

(1) Commit the act of rape.

(2) Physically assist in the commission of such act.

La.R.S. 14:42, as last amended by 1993 La. Acts No. 630, § 1. "As previously stated by this court, '[a]ny penetration, however slight, of the aperture of the female genitalia, even its external features, is sufficient.'" *State v. Self*, 98-39, p. 3 (La.App. 3 Cir. 8/19/98), 719 So.2d 100, 101, *writ denied*, 98-2454 (La. 1/8/99), 734 So.2d 1229 (citing *State v. Bertrand*, 461 So.2d 1159, 1161 (La.App. 3 Cir. 1984), *writ denied*, 464 So.2d 314 (La.1985)).

"Louisiana jurisprudence has consistently held that the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even if there is no physical evidence." *State v. Leyva-Martinez*, 07-1255, pp. 6-7 (La.App. 3 Cir. 4/30/08), 981 So.2d 276, 282, *writ denied*, 08-1200 (La. 1/30/09), 999 So.2d 747 (citing *State v. Schexnaider*, 03-144 (La.App. 3 Cir. 6/4/03), 852 So.2d 450; *State v. Hotoph*, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, *writ denied*, 99-3477 (La. 6/30/00), 765 So.2d 1062, *and writ denied*, 00-150 (La. 6/30/00), 765 So.2d 1066); *see also, State v. Hubbard*, 97-916, pp. 9-10 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, 1104, *writ denied*, 98-643 (La. 8/28/98), 723 So.2d 415 ("[T]he *testimony* of the victim *alone*, unsubstantiated by physical evidence, is sufficient to support a conviction of rape.").

The evidence most favorable to the prosecution shows that, in 1994, J.S. was under the age of twelve. In August of that year, a man had her remove her pants and then proceeded to put his penis inside of her vagina; the penetration caused J.S. to experience pain in her lower abdomen, hurt enough to make her scream, and triggered menstruation. Although there was no physical evidence of trauma to J.S.'s vagina or anus, the doctor who examined J.S. and performed her rape kit said that it was not unusual for this type of activity to leave no physical evidence of trauma or injury in the victim, even in cases where the victim was a young girl.

When the authorities arrived, J.S. reported that she had been raped. A law enforcement officer collected the pants that J.S. was wearing at the time of his arrival on the scene. They had been present in the room at the time of the rape, and J.S. had put them on after the rape. Even though the garment technically belonged to J.S.'s mother, J.S. was the only person who wore the pants. Based upon a semen sample removed from the pants, the defendant was eventually identified as the perpetrator within a 99.9% certainty.

Therefore, when the evidence is viewed in the light most favorable to the prosecution, a reasonable fact finder could have found that the defendant used his penis to penetrate either the aperture or the external features of J.S.'s vagina when J.S. was a child under the age of twelve. Thus, there is sufficient evidence to support the defendant's aggravated rape conviction.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER ONE

In this assignment of error, the defendant argues that it was error for the trial court to admit State's Exhibit 8 into evidence. The defendant contends that he objected to the drawing that showed where the cuttings were taken from the

victim's pants on the basis that it was not drawn by any of the witnesses testifying at trial. When the prosecution responded that the diagram was part of the official records kept by the Acadiana Crime Lab, the court overruled the defense's objection. The defendant contends that this ruling was erroneous because the "business records exception to the hearsay rule does not permit the introduction of a document without affording an accused the right to cross-examine the maker of the report if the record was prepared for the purposes of, or in anticipation of, a criminal prosecution."

The defendant argues that the evidence constituted a violation of the confrontation clause based on *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004) and on the line of cases following *Crawford*. The defendant argues that the person who prepared the diagram was not an unavailable witness because, even though she had retired, she still performed contract work for the lab. The defendant adds that the drawing was testimonial because the maker knew or should have known that it would be used in a criminal prosecution.

Examination of the record shows that the defendant did, in fact, object to the introduction of State's Exhibit No. 8 (the evidence worksheet diagraming the locations from which the cuttings were made). However, the defense's objection did not mention any violation of the confrontation clause. Instead, the defense objected on the grounds that the prosecution failed to establish a proper foundation for the evidence:

> BY MR. LOPEZ: To the extent that we object obviously to the introduction of a document not prepared by Mr. Schiro or under his direction. As a matter of fact not even prepared when he was I believe even at the crime lab. I just don't think it's just, a proper foundation has been laid. We apparently . . . know who made it or at least who the initials are but that's all we know. And we object to it, to the introduction of it your honor. We don't think a proper

foundation has been laid for Mr. Schiro to introduce a document made
by someone else.

The defendant made no corresponding objection to Mr. Schiro's preceding testimony about the document.

The State responded by asking Mr. Schiro if State's Exhibit No. 8 was "part of the official records of this case from the Acadiana Crime Lab." Mr. Schiro responded that it was. The prosecution further inquired whether Mr. Schiro had personally inspected the document, and Mr. Schiro replied that he had. Following this exchange, the trial court overruled the defendant's objection.

Under La.Code Crim.P. art. 841, "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Evidentiary objections must be timely, on the record, and set forth the specific ground for the objection. La.Code Evid. art. 103. Moreover, "a new basis for an objection may not be urged for the first time on appeal[.]" *State v. Holmes*, 06-2988, p. 69 (La. 12/2/08), 5 So.3d 42, 88, *cert. denied*, ___ U.S. ___, 130 S.Ct. 70 (2009). Therefore, the defense cannot now change the basis of his objection to the introduction of the worksheet, and the defendant may only appeal the introduction of the evidence based upon the foundation laid therefor by the state.

Hence, this court's review of the propriety of the introduction of the ruling is limited to the basis stated on the record at the time of the objection. Evidentiary objections are reviewed under the harmless error standard of review as "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]" La.Code Evid. art. 103. Assuming *arguendo* that the trial court should have sustained the defendant's objection to the introduction of the worksheet on the basis of an improperly laid foundation, the

17

defense still failed to object to Dr. Schiro's testimony explaining the specifics contained in the document and the significance thereof. Thus, the admission of the document itself did not affect a substantial right of the defendant's because the relevant details of the worksheet were already in evidence.

Accordingly, this assignment of error is without merit.

## CONCLUSION

The defendant's conviction is affirmed.

**AFFIRMED.**